IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JEFFREY COLLINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15CV607 |
| | ) | |
| R. COVINGTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER, MEMORANDUM OPINION, AND
RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court for consideration of Defendants' Motion for

Summary Judgment [Doc. #44] filed by Jon Doe Torrez, T. Gauls, T. Deberry, Jon-Doe

Wallace, Jon-Doe Harris, P. Chavis, R. Covington, Jon-Doe Younger and Katy Poole

("Defendants").[1] Also before the Court is Plaintiff's Motion [Doc. #51] requesting assistance

in effecting service of process upon Defendants Nicholson, Oxindine, Sanderson, Simmons, and

McKnight. For the reasons that follow, the Court will recommend that Defendants' Motion for

Summary Judgment be granted and that this action be dismissed as to all defendants. In light

of that Recommendation, the Court will deny Plaintiff's Motion requesting assistance in

effecting further service of process.

---

[1] Defendants have noted certain corrections to Plaintiff's apparent misidentifications. Yolanda Gause has been identified by Plaintiff as "T. Gauls," Tonya Deberry as "T. Deberry," Jimmy Wallace as "Jon Doe Wallace," Larry Harris as "Jon Doe Harris," Paula Chavis as "P. Chavis," Toya Collins as "Jon Doe Younger," and Carol Torres as "Jon Doe Torrez."   (Motion for Summary Judgment [Doc. # 44] at 1.)

# I. FACTS, CLAIMS, AND PROCEDURAL HISTORY

This is a prisoner civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff's claims are set out in a Complaint [Doc. #2], describing an incident that occurred on February 13, 2015, and naming as defendants certain employees of North Carolina Department of Public Safety's Scotland Correctional Institution, where Plaintiff was then incarcerated.[2] The parties conducted discovery and Defendants have now filed a motion for summary judgment.

## A. Plaintiff's Claims.

Plaintiff alleges that on February 13, 2015, he ran to and around prison staff at SCI screaming in pain, that during the course of events he was struck with a baton to his legs and spinal area, that officers unnecessarily used their body weight, knees, and elbows to inflict harm, that his head was thrown repeatedly against the wall, and that he was "excessively sprayed" with pepper spray in his nostril rendering him unconscious. (Pl. Compl. at 3, 8-9.)[3] According to the Complaint, Plaintiff was dragged to the prison's medical facility despite having submitted to restraints, and was taken to the main medical observation room, while Defendants laughed and held him down in a chair. (Id.) According to Plaintiff, a nurse checked his vitals, discovered his rapid heart rate, and instructed staff to call 911 because he was having trouble breathing. Plaintiff alleges that prison staffers stood on the chain of his leg cuffs causing his skin to tear while he was waiting for an ambulance. (Id.)

---

[2] North Carolina Department of Public Safety's web site reflects that Plaintiff is currently incarcerated at the Lanesboro Correctional Institution in Polkton, North Carolina.

[3] For ease of reference, page numbers for citations to Plaintiff's submissions will refer to the sequential numbers generated by the Court's ECF system.

B.    Defendants' Evidence in Support of Summary Judgment

In support of their Motion for Summary Judgment, the moving Defendants submitted affidavits, documentary evidence, and a video recording of the February 13, 2015, incident on the cell block that is at the gravamen of Plaintiff's Complaint.  That evidence is summarized below.

1.    Ronald Covington Affidavit.

Captain Ronald Covington signed an Affidavit noting that he assists in the management of the inmate population at SCI, responds "to emergency situations at the facility," and has been trained in the management of inmates and the use of force.  (Covington Aff. [Doc. #49-31] ¶¶ 4, 6.)  Captain Covington states he responded to a code blue called on February 13, 2015, and observed Plaintiff "kicking, growling, and hitting staff."  (Id. ¶ 8.)  According to Captain Covington, "when correctional staff, including myself were finally able to get the Plaintiff under control Plaintiff was handcuffed and stood up" and staff "attempted to talk to him."  (Id. ¶ 9.) "Plaintiff became very aggressive again and was placed on the floor.  While on the floor the Plaintiff was kicking and attempted to bite me on my left arm.  At that time in order to gain control of the Plaintiff I sprayed a two second burst of OC Pepper Spray directly in the face of the Plaintiff . . . [to] try to gain control of Plaintiff and deter his violent and aggressive actions." (Id. ¶ 10-11.)

2.    Defendant Yolanda Gause Affidavit.

Defendant Yolanda Gause (identified by Plaintiff as T. Gauls), is an SCI Unit Manager, and has been trained in the use of force in connection with her work.  (Gause Aff. [Doc. #49-

34] ¶ 4.) In her Affidavit, Defendant Gause states that on February 13, 2015, a code blue was called on Plaintiff's unit at SCI, when she arrived she heard Plaintiff yelling "someone help me," and Defendant Covington was trying to calm him down. (Id. ¶ 8.) According to Defendant Gause, Plaintiff "continued to yell in a paranoid way." Defendant Covington "called for a set of restraints," and Plaintiff "was given a verbal order to comply and submit to be cuffed that he refused." (Id. ¶ 9.) Defendant Gause observed Plaintiff trying to bite Defendant Covington and observed Covington administering pepper spray in order to gain control of Plaintiff. (Id. ¶ 10.) Gause states that Plaintiff was placed in full restraints and was "escorted to medical." She notes that her only physical involvement was in holding Plaintiff's legs while he was placed in restraints. (Id. ¶ 11.) Once Plaintiff arrived at the medical unit, Plaintiff was assessed and taken to a local hospital via EMS. (Id. ¶ 12.)

### 3. Tonya Deberry Affidavit.

Defendant Tonya Deberry is a Correctional Sergeant at SCI and received training on the use of force. (Deberry Aff. [Doc. #49-33] ¶ 4.) In her affidavit, she states that on February 13, 2015, she heard loud screaming on Plaintiff's unit, saw the Plaintiff running and hollering, "God save me," and then saw him run into a door. (Id. ¶ 9.) Sergeant Deberry states that "Plaintiff was out of control" and "the other officers and I were finally able to get the Plaintiff handcuffed" and "under control so he would not hurt himself." (Id. ¶ 10.) She states that she recalls a code being called and that Defendant Wallace assisted her in responding to the code. (Id. ¶ 11.) Sergeant Deberry also notes that she was instructed to search Plaintiff's locker after

Plaintiff was escorted to medical, and she found a "green leafy substance wrapped up in a piece of toilet tissue." (Id. ¶ 13.)

    4.    Toya L. Collins ("Jon-Doe Younger") Affidavit.

Defendant Toya L. Collins is a Correctional Lieutenant employed at SCI and received training in the use of force. (Collins Aff. [Doc. #49-32] ¶¶ 3-4.) According to Lieutenant Collins, she is the person identified in Plaintiff's Complaint as Defendant "Jon Doe Younger." Lieutenant Collins states that a code blue was called on February 13, 2015, that she responded and observed Plaintiff "being aggressive and combative," and that staff were instructed to restrain Plaintiff "in full restraints due to his level of aggressiveness and combative behavior." (Id. ¶¶ 8-9.) However, "[a]fter correctional staff placed the Plaintiff in full restraints, it still did not reduce his level of aggressiveness and combativeness" and additional staff members were called in to assist. (Id. ¶ 10.) Plaintiff was then placed onto the elevator and escorted to medical where he was transported to "outside medical via EMS." (Id.)

    5.    Jimmy Wallace Affidavit.

Correctional Officer Jimmy Wallace states that he received training and is "experienced in the management of inmates." (Wallace Aff. [Doc. #49-21] ¶ 4.) He states that he responded to a code blue on February 13, 2015 at approximately 5:25 p.m, observed Plaintiff "acting aggressively and combatively towards staff members," "assisted in putting the Plaintiff in full restraints," and escorted Plaintiff "all the way to main medical." (Id. ¶¶ 8-9.) He stayed with Plaintiff until EMS arrived and then assisted Plaintiff in getting into the ambulance. (Id. ¶ 10.)

6.	Carol Torres Affidavit.

Carol Torres is a Correctional Captain at SCI and received training in the use of force. (Torres Aff. [Doc. # 49-18] ¶¶ 3-4.)  She states that she responded to a code blue on February 13, 2015, and observed "Plaintiff being aggressive and combative."  She notes that "staff were informed to restrain the Plaintiff in full restraints due to his level of aggressiveness and combative behavior." (Id. ¶¶ 8-9.)  She further states that restraints "did not prevent or reduce [Plaintiff's] level of aggressiveness and combativeness," and additional staff members were called in to assist.  She notes that Plaintiff was transported to "main medical" and then to "outside medical" via EMS.  (Id. ¶ 10.)

7.	Paula Chavis Affidavit.

Paula Chavis is a Correctional Officer at SCI and received training and is experienced in the management of inmates.  (Chavis Aff. [Doc. #49-30] ¶¶ 3, 4.)  Officer Chavis states that on February 13, 2015, at approximately 4:00 p.m, "Plaintiff ran by me, speaking loudly, 'God save me don't let them take me.'"  (Id. ¶ 7.)  According to Officer Chavis, she noted to Officer Nicholson that "something is wrong" with Plaintiff.  Plaintiff continued running and hit doors to two  cells while they were closed.  (Id. ¶ 8.) Officer Chavis informed Officer Deberry that Plaintiff "appears to be 'on something,'" and Officer Deberry gave Plaintiff "a direct order to stop" and Plaintiff refused.  (Id. ¶¶ 8-9.)  Officer Chavis states that she, along with "Deberry, Harris, and Correctional Officer Christa Nicholson grabbed Plaintiff trying to restrain him" but that Plaintiff continued to speak loudly stating "'God save me, don't let them take me.'"  (Id. ¶ 10.)  Officer Chavis states that, "I then drew my baton and delivered a strike to the Plaintiff's

6

lower right calf at which time he grabbed the baton." (Id. ¶ 11.) "Defendant Deberry then gave me a direct order to put my baton away because it was not necessary, and I immediately complied." (Id. ¶ 12.) According to Officer Chavis, "Plaintiff was finally placed on the floor in order to gain control until further assistance arrived." (Id. ¶13.)

        8.     Abhay Agarwal Affidavit.

Dr. Abhay Agarwal is a medical doctor who reviewed Plaintiff's medical records and concluded that Plaintiff's "care was appropriate, within the applicable standard of care and not deliberately indifferent to his medical needs." (Agarwal Aff. [Doc. #49-19] ¶ 4.) According to Dr. Agarwal, Plaintiff's medical records show that a nurse evaluated him on February 13, 2015, after a code blue was called, and that Plaintiff stated that "he smoked an unknown substance" and "complained of thirst to the nurse." After taking his vitals, "the nurse called the provider on call and received an order to transport the Plaintiff to local emergency room ("ER") for evaluation." (Id. ¶ 6.) Dr. Agarwal notes that ER staff documented that Plaintiff stated he "smoked something that made him crazy but was unable to state the substance he took." (Id. ¶ 7.) According to the ER records, Plaintiff reported "he was having hallucinations at the prison" and his eyes were bloodshot. (Id.) Dr. Agarwal further states that Plaintiff had a laceration to the left wrist and a minor superficial left forehead contusion. (Id.) He tested positive for cannabinoids and alcohol, and was given a diagnosis of "marijuana abuse, adverse effect - hallucinogen." (Id.) He was returned to the prison the same day with "no documentation of any serious physical injury." (Id.) The medical records show that the following day, Plaintiff declared a medical emergency and was seen by nursing for complaints

of numbness "of his hands and finger" and complaints of his handcuffs being "on too tight" a day earlier. (Id. ¶ 8.) He was assessed on February 17, 2015, "for complaints of cool hands and numbness in both hands." (Id. ¶ 9.) He was seen by a provider the next day, on February 18, 2015, but "did not verbalize any complaints to the provider during this visit and wanted to be put back on diabetic medication," which was ordered. (Id. ¶ 10.) Dr. Agarwal concluded that the records he reviewed "are not consistent with intent to cause a particular injury and not consistent with malicious or even reckless conduct." (Id. ¶¶ 13-14.)

        9.    Erica Dawson Affidavit.

Nurse Erica Dawson (R.N., B.S.N.) also reviewed Plaintiff's medical records, and the records are attached as an Exhibit to her Declaration. According to Nurse Dawson, in December 2014, Plaintiff executed a document indicating his refusal of oral diabetes medication that helped control his blood sugar levels. On January 9, 2015, he signed another refusal form refusing medication to treat diabetes. (Dawson Aff. [Doc. #49-2] ¶¶ 5-6.) Nurse Dawson states that Plaintiff's medical records reflect that on February 13, 2015, Plaintiff admitted smoking an unknown substance and was "confused and had an altered mental status." (Id. ¶ 6.) According to Nurse Dawson, the records reflect that a nurse arrived in response to a code blue called on February 13, 2015, to find officers restraining the Plaintiff on the floor of his unit, that Plaintiff was brought to medical for evaluation, that he was restless and complained of thirst, and that an order was received to transport Plaintiff to a local emergency room. (Id. ¶ 7.) Nurse Dawson states that Plaintiff's "Utilization Review" records "show that a UR request was submitted for a 13 February 2015 ER visit due to unresponsiveness due to an unknown substance use." (Id.

¶ 8.)  According to Nurse Dawson, the ER records further indicate that "Plaintiff stated he smoked something that made him crazy" and that he thought it was a cigarette. (Id. ¶ 9.) She states that the ER records firmly indicate that he "reported he was having hallucinations at the prison," that his "eyes were bloodshot," and that he "refused to allow a nurse to assess heart, lung, and abdominal sounds." (Id.)  Nurse Dawson states that according to ER records, medical staff noted a "laceration to the left wrist" and a physical examination "showed a minor superficial left forehead contusion." (Id.)  His chief complaint was listed as "bizarre behavior, hallucinations with auditory nature," and his drug screen was positive for cannabinoids. (Id.) Plaintiff was discharged the same day and complained of pain in his right knee. (Id. ¶ 10.) According to Nurse Dawson, Plaintiff's medical records reflect that the following day Plaintiff "declared a medical emergency" due to numbness in his hands and fingers and also advised nursing staff that the handcuffs from the prior day "were on too tight," although no bruising or swelling was observed. (Id.)  A follow-up examination was scheduled. (Id.)  Medical records reflect that the next day, on February 17, 2015, Plaintiff was assessed by nursing staff based upon his complaints of coolness and numbness in his hands and was scheduled for a follow-up examination. (Id. ¶ 11.)  On February 18, 2015, Plaintiff was seen by a medical provider and requested to be back on diabetic medication, which was ordered. (Id. ¶ 12.) According to Nurse Dawson, Plaintiff was taken to the emergency room again a few days later, with records again reflecting a diagnosis of marijuana abuse, chemical dependency, anxiety, and panic attacks. (Id. ¶ 14.)

      10.     Katy Poole Affidavit.

Katy Poole is the Correctional Facility Administrator at SCI. Ms. Poole states that an investigation report was completed in 2015 related to the use of force involving Plaintiff on or about February 13, 2015. (Affidavit of Katy Poole [Doc. # 49-22] ¶¶ 3,12.) Ms. Poole explains that no photographs were taken following the use of force due to Plaintiff being "disruptive and in need of emergency medical care," that an incident report was prepared and attached to her declaration, and that surveillance footage was obtained and is attached to her affidavit. (Id. ¶¶ 12-13.) Ms. Poole indicates that SCI's review indicates that policies were followed and that staff "used only the amount of force needed to control the situation." (Id. ¶ 14.)

11. Video Recording of the Incident.

Defendants filed the video footage of the incident occurring on the cell block and Plaintiff and Defendants refer to the video in their submissions. The Court has reviewed the recording and notes the events reflected in the video.

Plaintiff is first seen skipping and running down a hallway, seemingly not fully aware of his surroundings. He runs into a closed door. He is followed by SCI staff trying to communicate with him. A staff member pushes him towards a wall in an effort to control/stop him. Plaintiff resists and uses his hands to push the staff member away. In response, Plaintiff is struck in the leg by an officer using a baton and her foot. (Affidavit of Katy Poole [Doc. #49-22] Ex. D, Time-Stamp :01-:17.) Additional SCI staff arrive and depart as efforts are made to restrain and control Plaintiff. Plaintiff continues to resist. Plaintiff is brought to the ground. (Id. at :18-:42.) While on the ground, Plaintiff's arms and legs continue to flail as he resists efforts to restrain him. (Id. at :43-:59.) SCI staff appear to use hands and body weight to

control or restrain Plaintiff, and Plaintiff continues to resist. SCI staff are seen surrounding Plaintiff, and it is evident that Plaintiff is not submitting to staff members. Additional SCI staff continue to arrive to assist. (Id. at 1:00-3:01.) Plaintiff is brought to his feet, he appears to be propped or held against a wall by his shoulders, and one SCI staff member, presumably Defendant Ronald Covington, holds Plaintiff's shoulders or chest with one hand using his body weight to restrain Plaintiff. (Id. at 3:02 - 3:40.) For a period, the struggling appears to lessen, and some SCI staff members depart while others are standing and watching. (Id. at 3:41-7:23.) However, Plaintiff then becomes more animated until he either falls or is taken to the floor and another struggle begins. (Id. at 7:24-8:06.) As the intensity of the struggle increases, additional staff respond, and one prison officer can be seen reaching around to the back of their uniform, apparently reaching for pepper spray, as Plaintiff continues to resist on the ground. At this point in the video, prison staff are surrounding Plaintiff and are often blocking the camera's view of the events. (Id. at 8:07–10:45.) Plaintiff is then lifted to his feet and can be seen walking under his own power down the hallway away from the camera in restraints. (Id. at 10:46-11:20.)

C.      Plaintiff's Response

In response to the Motion for Summary Judgment, Plaintiff submitted a Memorandum of Law together with an appended notarized statement "Victim's Statement Affidavit of Facts." (Plaintiff's Memo. and Affidavit [Doc. #52] at 1-4).  The first page,  titled "Memorandum of Law," refers to the Victim's Statement on the following page and also references "Additional Exhibits attached."  The exhibits are: portions of the complaint (Ex. 1), the surveillance footage of the incident (Ex. 2), and Plaintiff's medical records (Ex. 3).

According to Plaintiff, his Eighth Amendment right to be free from excessive force was violated by SCI staff on February 13, 2015.   (Plaintiff's Affidavit and Statement [Doc. #52] at 2.)  Plaintiff explains that at the time of the incident, he was experiencing a "mental breakdown," "mental depression," and "diabetic nerve pain."  (Id.)  Much, but not all, of Plaintiff's opposition is based upon his review of the video footage from SCI.  For example, he alleges that he was "excessively sprayed" with pepper spray and "struck with batons by staff members at Scotland Correctional per surveillance footage."   He further contends that "surveillance footage on February 13, 2015 show Plaintiff Jeffrey Collington skipping down a hallway on Tan-2 unit, then running into a corridor with no where to go," and "surveillance footage show [Defendants Nicholson, Chavis, Harris and Deberry] bravely, maliciously and sadistically assaulting Plaintiff Jeffrey Collington until additional staff arrived to continue the unlawful acts." (Id. at 2-3.) Plaintiff contends that Defendants Covington, Collins and other staff were "seen approaching the incident on the surveillance footage" and that Defendants Oxindine, Gause, and Sanderson "were also identified by the surveillance footage as the named Defendants above, used excessive

force on Plaintiff Jeffrey Collington while I was already restrained in a full set of restraints," consisting of handcuffs, leg-ankle cuffs and a "blackbox." (Id. at 3.) Plaintiff alleges that after he was placed in restraints, "the surveillance footage shows Defendant Ronald Covington choking the Plaintiff with his hands/arm around Plaintiff's neck, and throwing the Plaintiff's head back and forth against the wall," and "the surveillance footage shows Plaintiff being throw[n] back to the ground" and "all the staff members make a circle around the Plaintiff to where you can no longer see Plaintiff laying on the ground." (Id. at 3-4.) According to Plaintiff, "[w]hile on the ground Defendant Covington sprays OC pepper spray directly up Plaintiff's right nostril" and he "went unconscious." (Id. at 4.) Plaintiff contends that the "footage show medical staff [who] are wearing 'Blue Uniforms' going back onto the elevator," and "[m]oments later the Defendants named are seen escorting me onto the elevator. I was later woken up by a nurse at Scotland Memorial Hospital." (Id.)

D. Medical Records

Plaintiff and Defendants each submitted Plaintiff's medical records in support of their respective positions. The Court notes that Plaintiff's submission is a duplicate of a portion of the extensive submission of medical records by Defendants and bears the Court's ECF stamp from Defendants' earlier filing. Because the Plaintiff's submission covers the relevant periods and events, the Court will review and rely on these documents.

According to Plaintiff's medical records, on the date that Plaintiff was placed in restraints, February 13, 2015, he tested positive for cannabinoids (Id. at 28), reported to medical staff that "he smoked an unknown substance" (Id. at 16-17, 51), suffered a "minor superficial left

forehead contusion," (Id. at 66), and his hospital discharge notes reflect a final diagnosis of marijuana abuse (Id. at 83) and an additional diagnosis of "adverse effect - hallucinogen," "Dehydration," and "Panic attack" (Id. at 83). The records reflect that Plaintiff returned from the emergency room on February 13, 2015, with no acute distress but reported "right knee pain" and a follow-up examination was scheduled. (Id. at 49.) The following day, Plaintiff complained of numbness in his hands and that the handcuffs from the prior day had been too tight. (Id. at 49.) Medical records reflect that during a follow-up examination on February 18, 2015, Plaintiff verbalized "no current complaints" (Id. at 39), and was placed back on medication for his diabetes. He was taken to the emergency room again a few days later, and was again diagnosed with marijuana abuse, with a potential need for psychiatric evaluation. (Id. at 50.)

II.     DISCUSSION

A.     Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists. Fed. R. Civ. P. 56. A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to

come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials).

The parties both rely, at least in part, on video evidence reflecting events on February 13, 2015. The Court notes that the Supreme Court has noted that at summary judgment:

> courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts. There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. . . .

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L. Ed.2d 686 (2007) (internal citations omitted); see also Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (noting that under Scott, when a video "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

B.     Eighth Amendment Excessive Force Claim

The Eighth Amendment's prohibition against cruel and unusual punishment extends to the treatment of prisoners by prison officials. Hill v. Crum, 727 F.3d 312, 317 (4th Cir. 2013); Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eight Amendment." Ingraham v. Wright, 430 U.S. 651 670 (1977) (internal citations and quotations omitted). With respect to an excessive force claim, the "core judicial inquiry," is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). As noted by the Court of Appeals for the Fourth Circuit, "[t]he Supreme Court has set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with 'wantonness': (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts to temper the severity of a forceful response.'" Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008). "Prison officials are given a certain amount of discretion in decisions to use force" because "they are frequently called upon to maintain order, quell disturbances, and act in haste, under pressure . . . frequently without the luxury of a second chance." Geddings v. Roberts, 1:15CV264, 2018 WL 1626116, at *9 (M.D.N.C. 2018) (internal citations and quotations omitted). The focus is "whether the evidence supports the inference that the guards wantonly punished" the prisoner. Williams, 77 F.3d at 763-64.

16

In the present case, viewing the evidence in the light most favorable to Plaintiff, and considering Plaintiff's uncontested medical records submitted by both parties and the video surveillance footage also referred to by both parties, the evidence reflects that at approximately 4:45 p.m. on February 13, 2015, Plaintiff was acting under the influence of a controlled substance and was potentially suffering some type of mental breakdown, and was seen by correctional officers skipping or running down the hallway of his dormitory unit past and around prison staff, while screaming or asking to be saved. While Plaintiff attributes his behavior to a mental breakdown or nerve pain, medical records submitted by Plaintiff confirm a positive test result for cannabinoids and reflect his statement to ER staff that he had smoked an unknown substance and that he had been hallucinating.[4]

Plaintiff alleges that officers used excessive force in responding to his conduct, but these contentions are directly contradicted by the surveillance video, which shows officers trying to control Plaintiff as he continues to resist, as described above. Specifically with respect to the first Whitley factor in the present case, the need for the use of force, the Court notes that it is undisputed that Plaintiff did not respond to direct orders from SCI officers, did not appear in control of his body, was shouting and skipping, was growling and biting or attempting to bite staff, and appeared aggressive towards SCI staff. All of this taken together indicates that some degree of force was justifiable. Similarly, with respect to the third Whitley factor, the threat

---

[4] Moreover, the cause of Plaintiff's conduct is not material in any event because there is no evidence in the record suggesting that Defendants were aware of what precipitated Plaintiff's erratic conduct or that their response would have been different had they known of some other cause. Indeed, whether caused by use of substance or a mental health condition, the focus is on the response of SCI staff in reacting to an unpredictable and potentially volatile situation.

"reasonably perceived" by Defendants, it is clear based on the undisputed facts that SCI staff reasonably perceived Plaintiff's conduct, including his failure to respond to orders, his continued physical resistance to efforts by SCI officers to control his conduct, and his growling, biting and flailing, as threatening conduct. Id. at 763. Defendant clearly presented a danger to himself, to other inmates, and to SCI staff members. With respect to the relationship between the need for force and the amount of force used (the second Whitley factor) and the efforts to temper the force used (the fourth Whitley factor), the Court finds that the undisputed evidence reflects that officers used only the force necessary to control Plaintiff. One officer briefly used a baton on Defendant's leg, but then put the baton away. Officers used their body weight to try to control Plaintiff so that they could take him for medical evaluation, and only continued to use force in response to Plaintiff's continued efforts to resist.

Specifically as to the use of pepper spray, the Court of Appeals for the Fourth Circuit has "generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain. . . . However, mace can be constitutionally used in small quantities to prevent riots and escapes or to control a recalcitrant inmate. A limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate." Williams, 77 F.3d at 763 (internal quotations and citations omitted). Here, a limited burst of pepper spray is balanced against the need to maintain order and prevent injuries to staff and to Plaintiff in light of Plaintiff's erratic and aggressive behavior. Id. ("[B]ecause a limited use of mace constitutes a relatively 'mild' response compared to other forms of force, the initial

18

application of mace indicates a 'tempered" response by the prison officials.").  In other cases, courts have found the application of pepper spray to be reasonable when an inmate ignores official commands or when the pepper spray is needed to restore order  <u>Pevia v. Shearin</u>,  Civil No. ELH-13-2912, 2015 WL 629001, at *11 (D. Md. 2015) (collecting cases).   In this case, the use of pepper spray was commensurate with Plaintiff's efforts to resist correctional officers. Defendant Covington did not use pepper spray as a first line of response, but did so only after Plaintiff failed to comply with verbal commands, after a single baton strike had no visible impact, and after numerous correctional officers were unable to get Plaintiff to stop resisting. To the extent that Plaintiff contends that he was not resisting officers, the video recording of events directly contradicts Plaintiff's representation that he was not resisting.

Finally, the Court notes Plaintiff's medical records, including follow-up visits with medical staff, do not support Plaintiff's claim of harm as a result of the incident.  The Supreme Court has clarified that the relevant inquiry for an excessive force claim is the amount of force used, not the injuries sustained, but the injury analysis is not irrelevant, as "[t]he extent of injury may also provide some indication of the amount of force applied."  <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010).  The lack of any significant harm to Plaintiff as a result of the incident further reflects that the amount of force was not excessive in the circumstances presented.

For all of these reasons, the Court concludes that Plaintiff has failed to present evidence from which a jury could return a verdict in his favor.

C.    Qualified Immunity

The Court notes that in the Motion for Summary Judgment, Defendants also contend that they are entitled to qualified immunity. (Defs.' Br. [Doc. #49] at 23-24.) A court generally considers first in the qualified immunity analysis whether a constitutional violation has occurred. Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013). The above discussion reflects that Plaintiff has not presented facts from which a jury could find a constitutional violation. However, even if Plaintiff could establish a potential constitutional violation, the Court would still conclude that Defendants are entitled to qualified immunity. On this issue, the Court considers whether the constitutional right "was clearly established at the time of the alleged misconduct." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004). The proper inquiry focuses on whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted . . . or whether the state of the law [at the time of the incident alleged] gave 'fair warning' to the officials that the conduct was unconstitutional." Clement v. Gomez, 298 F.3d 898, 906 (4th Cir. 2002) (internal citations and quotations omitted). Here, the evidence reflects a non-compliant inmate resisting verbal and physical efforts to restrain him. Under these circumstances, the Court concludes that it would not be clear to a reasonable officer that the conduct of any of the Defendants was unlawful.

For all of these reasons, the Court will recommend that Defendants' Motion for Summary Judgment be granted.[5]

---

[5] To the extent that Plaintiff's Amended Complaint can be read to assert a claim for deliberate indifference to his medical needs, Plaintiff's complaint does not identify a defendant or conduct that supports a viable claim. The Court notes that Plaintiff must establish that Defendants acted with "deliberate indifference" to his "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Here, the sequence of events began at approximately 4:45 p.m. on February 13, 2015 according to Plaintiff, and he was fully restrained, transported to the prison medical facility and then registered at the hospital by 7:03 p.m. Plaintiff was discharged the same day. (Medical Record [Doc. #52] at 62, 67.)

D.    Plaintiff's Request to Enforce Service Upon Defendants

The record reflects that Defendants Nicholson, Oxindine, Sanderson, and McNight have not been served despite efforts by the U.S. Marshals Service to effect service with information provided by Plaintiff.  [Docs. #19, #30,  #48.]  In response to this Court's notice [Doc. #48] that named Defendants Nicholson,  Oxindine, Sanderson,  Simmons, and McKnight had not been served, Plaintiff filed a Motion [Doc. #51] requesting assistance in obtaining service on these Defendants.  However, as set out above, Plaintiff has failed to present evidence from which a jury could find a violation of his constitutional rights by any of the Defendants. Therefore, the Court will recommend that Plaintiff's claims be dismissed.  In light of that recommendation, there is no need to attempt to obtain service on the remaining Defendants, and Plaintiff's Motion will be denied.

III.    CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion [Doc. #51] requesting assistance in obtaining service is DENIED.

IT IS RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #44] be GRANTED and that Plaintiff's claims be dismissed with prejudice.

This, the 13th day of August, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
